IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


**JAMES ANTHONY LAMPASONE**,

        Plaintiff,

        v.                      Case No. 2:18cv879

**THE VILLAGE OF TILTONSVILLE, OHIO,**

    and

**OFFICER GARLAND "GENE" GRIM**,        <u>**COMPLAINT AND**</u>
                                            <u>**JURY DEMAND**</u>

    and

**CHIEF JERRY DAVIS**,

    and

**OFFICER JOHN INGRAM**,

    and

**OFFICER BEN COBLENTZ**,

        Defendants.


<u>**JURISDICTION**</u>

1.     This is a civil rights action alleging police misconduct.  This case involves an extended series of unlawful arrests, prosecutions, uses of force, unlawful evictions from his home, separation from his children, and retaliatory acts against the Plaintiff by officers of the Tiltonsville, Ohio Police Department.  The Plaintiff alleges that the Defendants violated his rights guaranteed by the First, Fourth and Fourteenth Amendments to the

United States Constitution, as protected by 42 U.S.C. §1983.  The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

### PARTIES

2.  Plaintiff James Anthony Lampasone is a 45-year-old citizen of the United States and a resident of the Village of Tiltonsville, Ohio, located in Jefferson County.

3.  Defendant Village of Tiltonsville is a duly authorized and operating municipality, and a political subdivision of the State of Ohio.  It was at all times relevant the employer, master and principal of Defendants Grim, Ingram, Coblentz and Davis.

4.  Defendant Grim is and was at all times relevant a police officer and an employee, agent and servant of Defendant Village of Tiltonsville.

5.  Defendant Ingram is and was at all times relevant a police officer and an employee, agent and servant of Defendant Village of Tiltonsville.

6.  Defendant Coblentz was at all times relevant a police officer and an employee, agent and servant of Defendant Village of Tiltonsville.

7.  Defendant Davis is and was at all times relevant the Chief of Police and an employee, agent and servant of Defendant Village of Tiltonsville; the highest ranking policy-making official within the Tiltonsville Police Department; and the supervisor of Defendants Grim, Ingram and Coblentz.

8.  Defendants Grim, Ingram, Coblentz, and Davis are sued in their individual capacities and Defendant Davis is additionally sued in his official capacity.  All of the actions of Defendants Grim, Ingram, Colbentz, and Davis herein were done within the scope of their employment, and under color of state law.  Further, all acts of Defendants Grim, Ingram, Coblentz, and Davis herein were done knowingly, recklessly, in bad faith

and/or maliciously.

## FACTS

### A. Background Information

9.      In June of 2016, Plaintiff James Lampasone and his wife Dawn resided in an apartment at 209 Maryland Street, Apartment D, Tiltonsville, Ohio. Mr. Lampasone had grown up in that area, and his parents and siblings also lived nearby. James and Dawn had married in 2008. They had two children, Angelina, age 5, and Vincent, age 1.

10.     At that time, Mr. Lampasone worked as a mail carrier for the United States Postal Service, generally working three 10-hour shifts per week. The rest of the week he was a father who had close contact with and custodial responsibility for his children.

11.     One day in 2016, Dawn Lampasone advised James that she had secretly been seeing another man. The relationship was a romantic one, and she considered the other man to be her "boyfriend". Further, she advised Mr. Lampasone that she was pregnant and the boyfriend was the father. However, Mrs. Lampasone indicated no intention to move out, or to file for divorce. She continued to live in the apartment with the Plaintiff.

12.     After revealing her situation, Mrs. Lampasone began to engage in a series of actions which the Plaintiff believed were designed to antagonize him. She began to assert that items of marital property belonged to her alone, and similar minor disputes. Although their apartment was rented in the name of James Lampasone, his wife began to tell him that she did not want him at the apartment at times when she was there. She did, however, want him to be at home to care for the children whenever she was working or out

3

socially. This led inevitably to arguments, because Mr. Lampasone would not agree to be sent away from his home and his children whenever she instructed him to leave. For a period of several months, as described more fully below, members of the Tiltonsville Police Department decided to intervene in this civil domestic relations situation, exercising the coercive power of their authority as police officers to repeatedly deprive Mr. Lampasone of his constitutional rights.

**B. The Incident of June 18, 2016**

13. Mr. and Mrs. Lampasone each had a separate cell phone which they routinely used. On the afternoon of June 18, 2016, both husband and wife were at home with the children. Mrs. Lampasone demanded that James leave the home, and also that he give her the cell phone that he used, which was in his pocket. Mr. Lampasone said no. Mrs. Lampasone grabbed James and tried to reach into his pocket and take the phone by force.

14. Mr. Lampasone pulled away from her, without ever touching her or using any force of any kind, and walked out onto the front porch of the apartment. After waiting outside for several minutes, James attempted to go back into his home but found that his wife had locked him out. When she refused to let him back inside, and was yelling that he had to leave, Mr. Lampasone called the Tiltonsville Police Department for assistance.

15. A police officer, one Lieutenant Harter, responded to the Plaintiff's call. When he arrived, Mr. Lampasone explained that he had called the police because his wife got physical with him and tried to fight with him to get the phone out of his pocket. He explained that now she had him locked out, and was demanding that he leave his own home. Mr. Lampasone truthfully stated that his name was on the lease, he lived there, his

children were inside and he had the same rights as his wife to be there.

16.     The officer gained admission to the home, went inside and spoke with the Plaintiff's wife.  She claimed that Mr. Lampasone had "stolen" one of their phones.  She did not allege that Mr. Lampasone had been violent or threatening toward her, and she denied having any marks or any concern for her safety.  When the officer asked if she had any fear of him, Mrs. Lampasone explained that she was not afraid, it was just that "I'd rather him not be here" right now.  She told Mr. Lampasone, in the officer's presence, "when I come home, you're not allowed to stay here, I want you to leave when I come home."  Unfortunately the Tiltonsville Police lieutenant then proceeded to enforce Mrs. Lampasone's stated personal preference.

17.     After his conversation with Mrs. Lampasone, Lieutenant Harter told James Lampasone "here's how it's going to work", and that he wanted Mr. Lampasone to leave the premises, to "get his stuff and go."  Mr. Lampasone protested this, pointing out that "she was trying to fight with me, so I called the cops, now I gotta leave." Mr. Lampasone told the officer that he wished to take his children with him, indicating "I'm the one who takes care of these kids."  He was told he had to leave the children there.  Mr. Lampasone was threatened with arrest if he did not comply, even though Mr. Lampasone had committed no crime.

18.     Mr. Lampasone questioned again why it was him who needed to leave.  He pointed out again that this was his home, these were his children, there was no domestic case filed or court order pending, and he did not understand how the Tiltonsville Police had the authority to instruct him to leave the premises.  James reminded the officer that it was his wife who grabbed him, and he had been the one who called the police.  In response,

the officer suggested, "I can arrest you both. Then Children's Services gets involved. Takes the kids." In response to this threat, Mr. Lampasone told the officer he did not want that to happen, so he would comply. As the officer's report accurately described it, "Jim Lampasone . . . reluctantly agreed to leave for the night."

19.     Significantly, throughout this entire event Mr. Lampasone was always peaceful in his demeanor with the Tiltonsville police officer. The Plaintiff never threatened the officer or approached him aggressively, even when he was questioning the propriety of the officer's threats and instructions. And the Plaintiff ultimately cooperated. He agreed to obey what was certainly an unlawful instruction from the officer that he go away from his children and stay out of his own home.

## C.  The Incident of July 12, 2016

20.     On the afternoon of July 12, 2016 the Tiltonsville Police Department came back to the Lampasone residence. This time they were called by the Plaintiff's wife. She indicated that she wanted their help in forcing her husband to get out of the house once again.

21.     This time Defendant Officer Grim was on duty and responded to the call. Defendant Grim arrived and found Mr. Lampasone sitting outside the apartment. Grim indicated that he was familiar with the events that had transpired when Lieutenant Harter had come out in June. Mr. Lampasone was a lawful resident of the premises, the named leaseholder, and had a legal right to be there. No divorce case had been filed, and there were no pending court orders of any kind regarding this marriage, residency or custody.

22.     Officer Grim asked Mr. Lampasone what was going on. The Plaintiff explained briefly that he woke up that morning, handled the kids' usual routines, and then

6

took them to the swimming pool. When he returned his wife was awake. They argued because she had taken some of his money, and she called the Tiltonsville Police to see if they would order him to leave his house, as they had done the previous time.

23. Officer Grim talked to Mrs. Lampasone, and then as Officer Harter had done during the previous contact, Grim took the wife's side and agreed to use his authority to enforce her demands. He advised the Plaintiff that it would be necessary for him to leave, and to sleep somewhere else that night. Grim further required Mr. Lampasone to provide his personal information, including his full name, date of birth, social security number and personal phone number. Mr. Lampasone did so, without complaint. The Plaintiff did complain about being forced by police to leave his own home, and stated "what if I refuse? Then I'm going to jail." But he eventually complied again, without incident.

24. Having spoken to Mrs. Lampasone, Officer Grim confirmed that "she said there's nothing about violence, just an argument." Nevertheless, Officer Grim threatened Mr. Lampasone that if Grim were called over to the Plaintiff's house again for any reason, regardless of the circumstances, he would file a criminal prosecution against Mr. Lampasone. Grim said this was because he was "tired of coming over here."

25. Again on this date, as he had the previous occasion, Mr. Lampasone never did anything violent, threatening or aggressive toward the police officer. He never insulted or verbally attacked the police officer, he never yelled or screamed at the officer, he never was belligerent or out of control. He did protest and question the officer's order in a calm fashion, but then he did what the police officer instructed even though he believed it was unlawful and unfair.

7

## D.  The Incident of August 18, 2016

26.     On the afternoon of August 18, 2016, Mrs. Lampasone once more called the Tiltonsville Police regarding her husband.   Defendant Officer Grim was on duty and responded to the call.  Mrs. Lampasone met the officer outside, and she apparently wanted the police to remove James from the marital home once again.

27.     In her conversation with the officer, Mrs. Lampasone made a vague reference to her husband pushing her at some time, but she could not provide any specifics regarding any physical contact with Mr. Lampasone, she denied being hurt or having any marks, and she neither showed nor expressed any fear of violence from her husband.  At one point she claimed a neighbor saw whatever contact she was alleging, but the neighbor came out and did not corroborate her statement, and Mrs. Lampasone essentially abandoned her undefined assertion of misconduct.  This was not a domestic violence situation and Officer Grim recognized that.   No domestic violence charge was ever considered, nor was Mrs. Lampasone seeking one. She just wanted the Tiltonsville Police to take James out of the residence whenever she so desired.

28.     While Officer Grim was speaking with her, Plaintiff James Lampasone came out of the apartment carrying a basket of laundry.  He was surprised to see Officer Grim there, and he asked the officer "what's up?"  When Grim explained that Mrs. Lampasone had called the police, Mr. Lampasone told him there had been no incident at all, and that he had been doing the laundry.

29.     Officer Grim reminded Mr. Lampasone of his threat from the prior contact in July: "I told you last time what was gonna happen when I came back over here."  Mr. Lampasone said "I know you did" but "all I want to do is take care of my kids."

8

Nevertheless, Defendant Grim said he was "tired" of coming to the Plaintiff's home, and so he proceeded to carry out his previous threat.  He prepared, signed, swore to, and later filed a criminal complaint against Plaintiff James Lampasone for the offense of "disorderly conduct."

30.    The prosecution brought by Officer Grim lacked probable cause.  Mr. Lampasone had engaged in no conduct whatsoever which would constitute the crime, and Defendant Grim had no reliable or trustworthy evidence sufficient to make such an allegation. This charge was filed simply as a punishment to Mr. Lampasone, because his wife had called the police, Grim had been dispatched to respond, and the Plaintiff had asserted his belief that he had a right to stay with his kids in his home.

31.    Once again, in spite of the impropriety of the officer's actions, James Lampasone was cooperative.  He was never belligerent, or violent, or threatening toward the officer.  He never yelled or screamed at the officer.  When the officer told the Plaintiff "I need your i.d." Mr. Lampasone provided the officer with all of the information and documentation he requested.  At one point in recording all of Plaintiff's personal data Officer Grim asked "James, this is your current address?" and Mr. Lampasone confirmed that it was.

32.    The criminal charge was filed as Case No. 16-CRB-138, in Jefferson County Court #3, Dillonvale, Ohio.  Plaintiff was required to incur the cost of an attorney.  An arraignment was held on August 31, 2016, and pre-trials were set in September, October and November, before the charge was dismissed by the prosecutor on November 30, 2016.  The dismissal was a termination favorable to the Plaintiff.

33.     Mr. Lampasone could now see that this was likely to be an ongoing, recurring series of unpleasant occurrences.  This would not be good for either him or his children.  Further, it did not appear that his wife had any intention of taking steps to legally resolve the situation.  Therefore, Mr. Lampasone retained a domestic relations attorney and on September 1, 2016, he filed an action for divorce.

### E.  The Incident of September 8, 2016

34.     On approximately September 3, Mrs. Lampasone was served with the complaint and accompanying documents in the domestic case.  Those included documents relating to a shared parenting plan and the status of the marital residence.  The receipt of the divorce papers upset Mrs. Lampasone.

35.     On the afternoon of Friday, September 8, 2016, James Lampasone came home from work.  He was making tea on the stove when Mrs. Lampasone grabbed the tea and threw it on the floor.  James started another pot of tea.  Mrs. Lampasone entered the kitchen and poured that tea down the sink as well.  The Plaintiff did not react.

36.     Then Mrs. Lampasone told the Plaintiff that she was leaving with her boyfriend for the night and would be staying with him.  James had to be back to work at the Post Office beginning at 7:00 a.m. the next morning, and Mrs. Lampasone knew this.  She said "good luck finding someone to watch the kids in the morning."  James now understood this to mean that he might have to miss work the next day, and this upset him greatly.  Rather than react toward his wife, Mr. Lampasone went outside onto the front porch.  He was alone out there.

37.     Plaintiff called his father.  He was emotional, explaining to his father what was going on, venting his frustration to his dad, on the phone, by himself.

38.     As soon as James left the apartment, Dawn Lampasone called her friends at the neighboring apartment.  These were Rachel Sambuco, Ms. Sambuco's husband, and Ms. Sambuco's sister.  Upon information and belief, this had been planned in advance.  In any case, Mrs. Lampasone had her friends call the Tiltonsville Police and complain about Mr. Lampasone.  They did so, although James was committing no crime.  He was merely outside on his porch, alone, having an animated conversation with his dad on the phone.

39.     Mrs. Lampasone had her friend Ms. Sambuco call the police, rather than call herself, because Rachel Sambuco's sister-in-law was a police officer in the neighboring Village of Yorkville, and was known to the Tiltonsville police officers.  Mrs. Lampasone further wished to have this be a complaint initiated by a third party rather than by her.  Mr. Lampasone never saw or spoke to these friends of his wife.  They remained inside their own apartment until after police arrived.  Plaintiff was entirely unaware of their presence, or that they were observing him through the curtains of their front window.

### (1).  Officer Grim's Use of Deadly Force Upon the Plaintiff - The Chokehold

40.     Defendant Officer Grim was on duty and responded to Ms. Sambuco's call. He pulled his cruiser up to a position on the street, across from the apartment building, and stopped.  His cruiser windows were down.  When Officer Grim pulled up, Mr. Lampasone was visible, seated calmly and quietly in a chair on his front porch.  The Plaintiff was no longer speaking to his dad on the phone.  The officer was parked a distance of some 70-80 feet away from Mr. Lampasone.

41.     As the cruiser pulled up, Ms. Sambuco and her sister came out of the Sambuco apartment and hurried over to the officer.   Also, another resident of the apartment complex named Kristen Palazzo came out on her front porch to see what was happening.  Ms. Palazzo lived two doors down from Mr. Lampasone.  Officer Grim was still seated in his cruiser, and Ms. Sambuco was just beginning to speak to him through the driver's side window.  At the same time, Ms. Palazzo yelled from her porch down to Mr. Lampasone, asking him what was going on.  The Plaintiff, still seated calmly in the chair on his front porch, began to talk to Ms. Palazzo.  He was turned toward her, looking at her, and speaking in a voice loud enough that she could hear him.

42.     Officer Grim's body camera recorded these events.  As Ms. Sambuco and her sister approached Grim's window and began to speak to him, Mr. Lampasone is heard in the background saying something to Ms. Palazzo, but this conversation is in the distance and the Plaintiff's words are inaudible.

43.     Officer Grim immediately turned away from the women who had contacted the police, and turned his full attention to Mr. Lampasone seated up on the porch across the street.  This occurred within the first 5-10 seconds of Grim's arrival, and the officer never did have a conversation with the purported complaining parties until much later.

44.     Having heard Mr. Lampasone speaking to his neighbor Ms. Palazzo, Officer Grim mistakenly assumed that James was speaking to him instead. Officer Grim is a man with a long history of anger control problems, including several documented incidents. Grim incorrectly perceived this situation as some sort of insult to his authority.  He took personal offense, and began to retaliate against Mr. Lampasone immediately. Officer Grim escalated an otherwise non-confrontational event, and caused a conflict where none had

12

existed.

45. Still seated in his cruiser, Officer Grim yelled at Mr. Lampasone, "watch your mouth." The Plaintiff responded by asking "what?" Grim again yelled at Mr. Lampasone "don't be cussin." The Plaintiff is heard on the police recording asking the neighbor, Ms. Palazzo "what'd he say?", and then telling Officer Grim "I'm not talking to you." Grim commented to the women standing by the cruiser "he's gonna piss me off." At the same time Mr. Lampasone repeated "I'm not talking to you, I'm talking to Kristen." When Officer Grim stated "he's gonna piss me off," the officer opened the cruiser door, got out, and began walking across the street, directly at Mr. Lampasone, in an aggressive fashion.

46. When Officer Grim said the words "he's gonna piss me off", this was a spontaneous admission that he was angry at the Plaintiff simply because Mr. Lampasone had been speaking, and that the officer's actions immediately thereafter were a response to the Plaintiff speaking, and were motivated by his anger.

47. As he approached Mr. Lampasone, Defendant Grim made it clear why he was approaching. He said: "First of all, don't be yelling at me." The Plaintiff was still seated calmly in a chair on his own porch. Mr. Lampasone asked Officer Grim not to yell at him, and began to explain for the third time that he had been speaking to the neighbor Ms. Palazzo, and not to the officer.

48. At this point, Officer Grim completely lost control, and went into a rage. He walked up onto the Lampasone porch, shrieking at the Plaintiff at the top of his lungs, "Listen to me. Shut your fucking mouth. Now. Don't you yell at me. Ever. You know better than that. Don't you yell at me!" Officer Grim came right up to the Plaintiff, screaming at him in this manner. The Plaintiff, for reasons that are self-evident on the police video, was

fearful for his safety because the officer appeared to be unstable. Also, Officer Grim is an extremely large man, 6 feet or more in height and well over 300 pounds.

49. Mr. Lampasone asked the officer to stop yelling at him. Officer Grim responded "Really?" and then ordered the Plaintiff to "give me your license". At that time Mr. Lampasone did not have his drivers license. He had received a speeding ticket and learned that he had forgotten to renew his license. The license had been taken from him and he had been given a written order of "driving privileges" while he got the license issue straightened out with the Bureau of Motor Vehicles. So in response to the officer's command, Mr. Lampasone stated, truthfully, "I don't have a license." Moreover, the officer had no lawful basis to insist upon the Plaintiff providing a driver's license, and further, this same officer had obtained all of the identical information contained on the license when he was there in July, and again in August.

50. Hearing Mr. Lampasone's statement, Officer Grim reached around and took out his handcuffs, while screaming at the Plaintiff "Give me your i.d. now. Give me your i.d. Stand up!" Mr. Lampasone merely repeated his request that the officer not yell at him. The Plaintiff was reasonably and understandably frightened by Officer Grim's threatening demeanor. He was fearful of violence from the officer if he stood up, or if he permitted Grim to handcuff him which would render him incapable of protecting himself.

51. With cuffs in hand, leaning over the Plaintiff, Grim repeatedly screamed "stand up" and "give me your hands now." Mr. Lampasone asked the officer to stop yelling at him, and stated "no, I didn't do anything." In this regard the Plaintiff was correct. He had been seated in the same chair since before the officer arrived, he had only spoken to the officer in response to the officer's statements, and he had done nothing aggressive or

threatening at all. His demeanor at all times had been far more respectful and controlled than that of the officer. In addition, Officer Grim never told Mr. Lampasone that he was under arrest, and in light of Grim's complete melt-down the Plaintiff had no clear idea of what was happening.

52. Mr. Lampasone tried to talk to the officer. He said that the officer shouldn't yell at him like that when he didn't know what was going on. Immediately after the Plaintiff said this, Officer Grim violently attacked Mr. Lampasone. He grabbed Mr. Lampasone by the throat and began choking him, first with one hand and then with two, pressing down on the Plaintiff's windpipe and squeezing his neck tightly. At the same time he told the Plaintiff "I don't give a fuck what's going on. You are going to fucking stand up and give me your God damn hands now. Do you hear me? Do you hear me?"

53. Officer Grim continued this choke hold and strangling of the Plaintiff for more than a full minute. Mr. Lampasone was seated in the chair, and the officer was leaning over him, pressing his weight down on the Plaintiff. The Plaintiff was terrified and struggling for breath. Even then, Mr. Lampasone did not kick or punch or fight with the officer, or engage in any other violent response. He did try, in a non-violent and non-aggressive way, to pry Officer Grim's hands from around his throat. He was able to loosen the officer's grip at times, but the officer would take hold again. During this violence Mr. Lampasone shouted to the neighbor Ms. Palazzo to call his father, to tell his father to call the mayor, and to come take his phone.

54. As he held Mr. Lampasone in this choke hold, Officer Grim had his face close to the Plaintiff's, and was saying things like "Now you hear me? You really wanna do this? Really? Is this what you wanna do? Is this how you wanna do this?" When he could

15

respond, Mr. Lampasone said "get off me", and "I'm not doing shit, I was just sitting here" and "get away from me."

55.     This violent assault by Defendant Grim was a use of deadly force, in violation of several written departmental policies of the Tiltonsville Police Department. Officer Grim had been given these policies, he had been trained on them, and he knew he was obligated to obey and follow them. The rules that Grim violated included, but were not limited to, the following:

(1)     Code of Ethics. . . . I will never permit personal feelings . . . to influence my decisions. . . I will . . . never employ unnecessary force or violence. (T.P.D. Standard Operating Guidelines, p. 3).

(2)     Members of this department shall not be overbearing, oppressive or tyrannical in their relations with the members of the community. This regulation prohibits . . .: 1. Unreasonable orders given to citizens; . . . (p. 7)

(3)     Excessive Use of Force. Members of this department shall act at all times within the standards for use of force. See Use of Force Policy. (p. 10)

(4)     Use of Deadly Force Recognizing our legal and moral obligation to use force wisely and judiciously, it is the policy of this department that deadly force will never be resorted to unless an officer reasonably believes that a lesser degree of force would be insufficient to defend the life of another, one's self, or in limited situations, to apprehend a dangerous felon . . . Use of Force Techniques/Instructions:

A.     The intentional punching, striking or grabbing of the throat (trachea) or blocking or restricting the carotid neck arteries creates a substantial likelihood of death or great bodily harm and is therefore considered deadly force, and shall be used only in accordance with this policy. (pgs. 55-56).

(5)     Duty to Request Medical Attention . . . When an individual is . . . subjected to the carotid compression technique . . . an ambulance shall be called to the scene of the incident to examine the person. . . Medical personnel will determine whether further medical attention is required. (p. 103).

56.     After more than a minute, Defendant Grim released the choke hold, but he kept his forearm across Mr. Lampasone's neck area, and he leaned forward pressing his body weight down on the Plaintiff, who remained seated in his chair.  Even while being held down in this position, the Plaintiff continued to explain to Officer Grim that the officer was making a mistake, saying "I was talking to Kristen."  Grim asked "why did you have to yell at me for?", and Plaintiff responded "I didn't yell at you, I told you that, listen."

### (2).  Use of Unreasonable Force by Defendants Grim and Davis - Breaking Mr. Lampasone's Arm

57.     Defendant Grim continued to essentially lay on top of Mr. Lampasone until another Tiltonsville cruiser arrived, driven by Defendant Chief Davis.  As Davis got out and approached Mr. Lampasone's porch, he could not see the Plaintiff beneath Officer Grim, and he asked Grim "where's he at?"

58.     Mr. Lampasone answered Chief Davis as Davis came up onto the porch, and stated "I'm offering my hands. I'm not, I'm not resisting.  I'm not resisting, I ain't doin' shit. I'll talk to you. I'll talk to you."

59.     Chief Davis came to the Plaintiff, still seated in his chair.  Defendant Grim backed off of Mr. Lampasone slightly, and Chief Davis moved a small table that had been next to the chair. The Police Chief positioned himself immediately adjacent to Mr. Lampasone.  Mr. Lampasone was still reeling from the violence which had just occurred, and he was reasonably fearful of Officer Grim.  Mr. Lampasone intended at that moment to tell the Police Chief what had just transpired.  He intended to advise the Police Chief that he had been speaking to Ms. Palazzo when Grim arrived, that Grim got mad at this, and that Grim had attacked and choked him even though he had done nothing unlawful

whatsoever.  But Mr. Lampasone never got the chance to explain any of this.

60.     After moving the little table, Chief Davis told Mr. Lampasone to "come on Jimmy, stand up, stand up for me."  The Plaintiff immediately complied, stating "I'll talk to you", standing up out of the chair, and turning to face the Police Chief.  As Mr. Lampasone began to stand up, Officer Grim grabbed him from behind and started pulling on him. Without giving Mr. Lampasone a chance to say anything, Chief Davis instantly ordered the Plaintiff, 'Put your hands behind your back."  Mr. Lampasone said "wait a minute, we'll talk" and, referring to Officer Grim, told the Chief "I don't want him touching me." Chief Davis grabbed Plaintiff's right arm.

61.     Mr. Lampasone put his left hand on the porch railing for one or two seconds to steady himself, because the officers were pulling him in different directions, and he pleaded for them to "wait a minute."  However, when Davis and Grim pulled his arms backward and up the Plaintiff let go of the railing and allowed his arms to be moved to the rear.  Mr. Lampasone still had no understanding of why this was occurring, since he had committed no crime, neither officer had accused him of any crime, and neither officer had stated that he was under arrest.

62.     Although his hands were behind him, both officers continued to use force unnecessarily, jerking, twisting, and pulling backward and upward on Mr. Lampasone's arms, causing him pain.  The officers were on opposite sides of the Plaintiff, jostling him and tugging on him aggressively from different directions and Mr. Lampasone had difficulty maintaining his footing.  In spite of the officers' aggression, however, Mr. Lampasone never attempted to pull away and free himself from the officers.  He never attempted to force his hands and arms to the front of his body to prevent being cuffed.

63.     This use of force by Defendants Grim and Davis was both unnecessary and unreasonable.  In light of Mr. Lampasone's stated willingness to comply, and his immediate compliance with Defendant Davis's instruction to stand up, the Defendants' rapid resort to physical force was unjustified.  The Plaintiff was clearly being cooperative and attempting to de-escalate the situation.  Further, Mr. Lampasone had engaged in no actions or statements suggesting that he was a threat to anyone.  He had never made any attempt to flee the scene, or to actively resist the officers. There were no tense or rapidly evolving circumstances.  There was no need for any quick, split-second decisions by the officers in regard to the use of force.  The Plaintiff was unarmed, on his own front porch.  The Plaintiff was calm in his demeanor, not out of control, belligerent or turbulent.  There were multiple officers present.  Mr. Lampasone was not suspected of being intoxicated. And both officers had had multiple prior interactions with Mr. Lampasone, all of which had been peaceful and benign.

64.     Even when Defendants Grim and Davis did grab Mr. Lampasone and begin to pull on him, the Plaintiff did not swing his arms in the direction of either officer, or put his hands on, or push, or pull on either officer.  He never fought or wrestled with the officers. He never locked up and refused to be cuffed.  Nevertheless, the manner, amount, and severity of the combined force used by these two officers fractured the bones in Mr. Lampasone's arm, at the elbow and at the shoulder.  Mr. Lampasone began to feel pain right away.  After Plaintiff was released from jail later that night, his father iced the injured areas.  James sought medical attention immediately thereafter, and was diagnosed and treated.  He has had physical therapy for these injuries off-and-on since they occurred, he still experiences daily pain in his arm, and surgery remains a possibility.

65. This use of force clearly violated the written departmental policies of the Tiltonsville Police Department, and the training which Officer Grim and Chief Davis had received. Defendants Grim and Davis knew they were required to act in compliance with these rules. These included the following:

1. The Use of Non-Deadly Force. Recognizing our legal and moral responsibility to use force wisely and judiciously, it is the policy of this department that force shall never be resorted to until officers reasonably believe it is necessary in the performance of their legal duties. . . Non-deadly force is only authorized when an officer reasonably believes it is necessary to control a person . . . Control of a person through verbal commands shall always be the preferred method of control. (T.P.D. Standard Operating Guidelines, p. 57) (emphasis added).

2. Use of Force Policy . . . Officers should recognize that their conduct immediately connected to the use of force may be a factor which can influence the level of force necessary in a given situation. When reasonable under the totality of circumstances, officers should use advisements, warnings, verbal persuasion, and other tactics. . .

    The reasonableness of an officer's use of force is based upon the totality of the circumstances known by the officer at the moment the force is used, [including] . . .

    (a) Imminent threat of injury to an officer or others. . .
    (b) If the person is actively resisting seizure. . .
    (c) Circumstances are tense, uncertain and rapidly evolving. . .
    (d) The more severe the crime, the more force that may be justified.
    (e) Attempting to evade seizure by flight may justify escalating the level of force. (pgs. 100-102)

3. Use of Force Continuum . . .

    Level Two. Verbal Communication. Used in combination with a visible presence, the use of the voice can usually achieve the desired results: . . . It's always best to start out calm but firm, and non-threatening. . . The right combination of words in combination with officer presence can de-escalate a tense situation and prevent the need for a physical altercation. . .

20

> Level Three.  Control Holds & Restraints.  Certain situations may arise where words alone does not reduce the aggression. Sometimes Police Officers will need to get involved physically. At this level minimal force would involve the use of bare hands to guide, hold and restrain. . . Pain compliance holds could apply here, but only after ordinary holds fail to control an aggressive suspect. (p. 216)

At no time during his encounter with either or both of these police officers was Mr. Lampasone an "aggressive suspect" in any way, nor was he ever a suspect who was "out of control".

66.     After Mr. Lampasone was handcuffed, Police Chief Davis walked him down to the street and spoke to him by the cruiser.  The Plaintiff explained to Davis what had happened before he arrived.  He said that his wife's friends had call 911 "so the cops will come, that's the only reason."  Mr. Lampasone told the Chief that when Officer Grim pulled up "I'm saying something to Kristen, he starts yelling at me," "I'm not doing nothing, I'm sitting on that chair, talkin to Kristen."  In response to this information, Defendant Davis did not release the Plaintiff, or go and speak with Ms. Palazzo to see if Mr. Lampasone's statement was true.  Rather, the Defendants took Mr. Lampasone into custody, and locked him in a police cruiser.

67.     After the Plaintiff was in custody, Officer Grim falsely reported to Chief Davis at the scene that, before the Chief had arrived, Mr. Lampasone was "screaming at me", that he asked Mr. Lampasone to stop screaming at him and Lampasone said "I'll scream at who I want to", "I ain't goin' nowhere with you, fuck you" and "I ain't fucking givin you nothing". The Plaintiff had not been screaming at Officer Grim and had not, in fact, made any of those statements alleged by Grim.  Grim further told the Police Chief that when he asked Mr. Lampasone to get up from the chair, it was just to have a conversation: "I told

21

him . . . get up out of the chair, come talk to me. Tell me what's going on." Grim claimed that Mr. Lampasone responded "fuck you, fuck you," and that Lampasone "was screaming, wanting to fight." This was all false. On the contrary, just before Grim began choking him, Mr. Lampasone had attempted to explain what was going on and Grim had told him "I don't give a fuck what's going on." Officer Grim did not advise the Police Chief that he had taken out his handcuffs before he told the Plaintiff to stand up, and Grim made no mention of using a choke hold on Mr. Lampasone.

### (3). The Unreasonable Handcuffing of Mr. Lampasone

68.     Chief Davis left the scene. Mr. Lampasone was left in the cruiser for about 30 minutes while Defendant Grim spoke with the neighbors and with Dawn Lampasone. The handcuffs had been closed down too tightly on the Plaintiff's wrists. He was cuffed behind his back, and thus he was sitting on the cuffed hands. Mr. Lampasone was experiencing pain in his wrists from the tightness and the positioning of the cuffs. When Officer Grim finally returned to the cruiser, Mr. Lampasone complained about the handcuffs, and asked if the officer would remove them or loosen them. Defendant Grim said no.

69.     It was a ride of approximately twenty minutes from Tiltonsville to the Jefferson County Jail in Steubenville. During that time, the Plaintiff continued to experience pain from the tight handcuffs. Upon arrival, Mr. Lampasone was taken through the sallyport and held in the booking area while they waited for him to be admitted to the jail. Mr. Lampasone again complained to Officer Grim about the painful handcuffing. He told the officer "they're tight as hell". He complained that he had been cuffed that way for about an hour, that his hands were numb and probably turning colors. He asked Officer Grim to do

22

something to relieve the pain, but Grim again refused.

70.    When the cuffs were finally removed later at the jail, the Plaintiff's wrists were bruised, purple in color, with big indentations in the skin. Plaintiff experienced pain and discoloration in his wrists for days thereafter, but these conditions eventually went away without medical treatment.

71.    Defendants Grim and Davis caused Mr. Lampasone to be charged with the crime of "disorderly conduct" as a result of the events of September 8, 2016. This charge was brought without probable cause. Significantly, the Plaintiff was not charged with "resisting arrest." The Plaintiff subsequently pled no contest to disorderly conduct, a minor misdemeanor. He did so based upon the financial burden of proceeding to trial, not because he had violated the law. He was required to pay a fine of $50.00. This is not an arrestable offense, because Ohio has created a substantive right to be free from arrest for the commission of a minor misdemeanor. See R.C. §2935.26.

72.    While this false prosecution was pending, Mr. Lampasone voluntarily went to speak with Officer Grim, and then with Chief Davis, about the arrest and the ongoing series of incidents. The Plaintiff knew he had to continue to live in this community, and he sought to make peace. He hoped that by speaking humbly to them, and saying what they wanted to hear, he could persuade the Tiltonsville police to stop their campaign against him. Mr. Lampasone apologized, said he was wrong, and anything else he felt would appease the police. But these efforts were unsuccessful. As to the prosecution, Defendant Grim said "I gotta file 'em cause you went to jail." And the incidents continued.

73.    Officer Grim filed a police report regarding the events of September 8, but in it he failed to report that he had used a choke hold on Mr. Lampasone. This was an

23

intentional violation by Defendant Grim of his training and the written departmental policies of the Tiltonsville Police Department, including:

> (1)    Use of Force Reporting Required
>
>> It is the responsibility of any officer who uses physical force. . . to complete an original or supplementary report on the incident involved, and to specifically note the circumstances necessitating and manner of such use. . . Officers shall route reports of all incidents involving the use of any level of force higher than compliance holds to the Chief of Police for their review. (T.P.D. Standard Operating Guidelines, p. 60)
>
> (2)    Use of Force Policy . . .
>
>> Officers who use force as described in the Ohio Revised Statutes or the Operations Manual of the Tiltonsville Police Department must immediately report the circumstances to a command or supervisory officer and comply with all reporting requirements. (p. 101)

74.    Mr. Lampasone, through his father, made a complaint to the Village of Tiltonsville concerning the events of September 8.  As a result, Officer Grim was suspended from duty for a period of three (3) days, and required to enroll in an anger management class.  The suspension notice signed by the Mayor stated that the disciplinary action was based upon review of Grim's body camera video from the incident.  The Village found that Officer Grim "applied excessive use of force several times during the encounter", including "a direct violation of departmental guidelines" by "grabbing the throat", which "substantially increases the risk of death or great bodily harm and is a form of deadly force."  Chief Davis received no discipline.

75.    A month later Grim, was given a notice from the Police Chief and Village Solicitor advising that it had come to their attention he had not enrolled in any anger management class or counseling as they had instructed.  They informed Officer Grim that

24

he must "begin treatment," that "you need to get help in this area", and that "failure to do so may result in your termination". Upon information and belief, Officer Grim has never completed this anger management requirement, but he nevertheless remains currently on the roster of Tiltonsville police officers.

### F. The Incident of September 9, 2016

76. The next incident arose on the afternoon of the following day, September 9, 2016. Mr. Lampasone was in the apartment. His wife arrived in a vehicle with their infant son, accompanied by the neighbors who had called the police the day before, Rachel Sambuco and her husband. Dawn Lampasone got out of the car, left the baby in the car with the Sambucos, and went into the apartment to get some things. Mr. Lampasone went out to the car to get his son. As he approached, however, Rachel Sambuco and her husband locked the car doors and told James he could not have his son. They called Mr. Sambuco's sister, a police officer in neighboring Yorkville who was on duty at the time, to come back them up. Then they called the Tiltonsville Police for the same reason, to come and take their side against Mr. Lampasone.

77. Mr. Lampasone was trying the car doors, standing by the car windows, insisting that they unlock the car and give him his son. This was an entirely justified and lawful demand, as these neighbors had no right whatsoever to maintain possession of Mr. Lampasone's child. After much discussion these neighbors finally agreed to hand little Vinny to his father. Mr. Lampasone went to his porch and sat down with the child in his arms.

78. The Yorkville police officer (Ms. Sambuco's sister-in-law) arrived first. She was outside of her jurisdiction and had come solely because her brother called her.

25

Tiltonsville Officer Coblentz arrived thereafter. Mrs. Lampasone had come out of the apartment. A disagreement arose between Dawn and James Lampasone about which of them was going to have the child at that time. Officer Coblentz immediately took the side of Mrs. Lampasone and in opposition to the Plaintiff. He did so with no knowledge that Plaintiff had filed a domestic case, or what orders might have been issued in that case.

79. Mrs. Lampasone took the baby from her husband, Officer Coblentz asked "what's the problem," and Mrs. Lampasone said "I'm taking my son. He wants to be with me." Mr. Lampasone said the child was staying there at home with him. Officer Coblentz intervened in this purely civil matter, on the side of the wife. As Officer Coblentz described his role in his report, "James and Dawn Lampasone arguing over custody of the child. Dawn came to the residence and wanted to leave [with the child] but James wanted to keep the child. . . Ptl. Coblentz advised Dawn to leave residence. James became angry at the decision. Ptl. Coblentz advised James to contact an attorney for custody."

80. Mr. Lampasone told the officer truthfully that he already had filed a divorce action, and asked the officer to call Ms. Carinci, his attorney. Officer Coblentz said "it's not my problem", and "that's the mother of the child." He threatened the Plaintiff to "go inside", that he was "tired of dealing with" Mr. Lampasone, and that "you're gonna talk yourself into going to jail." He also threatened that "next time I come here somebody's going to jail," and that the Tiltonsville police were going to press charges against the Plaintiff again ("we're gonna do it over and over").

81. Mr. Lampasone went back up on his porch and called his attorney's office. He began to tell them what the officer had done. Hearing this, Officer Coblentz rushed up onto the Plaintiff's porch, immediately next to the Plaintiff, and began talking loudly,

26

disrupting his communication with counsel. When Mr. Lampasone tried to walk away so his counsel could hear him, Coblentz followed Plaintiff very closely talking in a loud manner. Mr. Lampasone said to his representative "he's harassing me right now."

82.     Even after Dawn Lampasone left with the child, Officer Coblentz told the female officer "I'm just gonna sit here and annoy him."  They stood there with the neighbors, adjacent to Plaintiff's home, and engaged in a loud and critical discussion of the Plaintiff.  When Plaintiff came off the porch and approached them, visibly recording their comments on his phone, Officer Coblentz went to Mr. Lampasone, grabbed him forcefully by the arm, turned him around and walked behind him pushing him back up onto the porch. In his report, Coblentz described this use of physical force: "James was recording with his phone . . . James walked over to where Patrolman Coblentz was conducting his investigation.  Patrolman Coblentz advised James to go back on his porch or he would be arrested. . . Coblentz then assisted James in walking to his porch."

83.     Officer Coblentz's threats to arrest and prosecute Plaintiff, his order that the wife could have custody of their child, his interference with Plaintiff's communication with his counsel, his use of physical force upon Plaintiff, and his order that Mr. Lampasone not come off his porch were all unreasonable and unlawful interferences with the Plaintiff's constitutional rights.

### G.  The Incident of October 17, 2016

84.     On October 17, 2016, Mr. Lampasone had been out spending time with his daughter Angelina, and returned her to the Maryland Street apartment and to the custody of Mrs. Lampasone at approximately 4:00 p.m.  Mrs. Lampasone was again next door with her friends in the Rachel Sambuco apartment when Plaintiff arrived.  Mrs. Lampasone

27

either called, or had others call on her behalf, the Tiltonsville Police Department concerning the presence of Mr. Lampasone at the marital residence.

85. Defendant Officer Grim responded to this call, although he was not supposed to be working until he completed anger management counseling, which he had not done. Mr. Lampasone was not present when Grim arrived, as he had already dropped off the child and left. Nevertheless, Officer Grim prepared a police report asserting that Plaintiff had violated a protection order. Defendants Grim, Ingram (who was listed as the "complainant") and Davis (who signed and swore to the criminal complaint) caused a criminal prosecution to be initiated against Mr. Lampasone.

86. The Defendants accused Mr. Lampasone of violating Ohio Revised Code §2919.27, recklessly violating the term of a protection order. The criminal charge was filed as Case No. 16-CRB-190, in Jefferson County Court #3, Dillonvale, Ohio. That charge was brought without probable cause, and it was dismissed by the prosecutor on December 29, 2016. The dismissal was a termination favorable to the Plaintiff.

## FIRST CLAIM - FALSE ARREST

87. The arrest of Mr. Lampasone by Defendants Grim and Davis on September 8, 2016, was without probable cause, and was an unlawful seizure in violation of the Fourth Amendment and 42 U.S.C. §1983.

## SECOND CLAIM - UNLAWFUL USES OF FORCE

88. The uses of force upon Mr. Lampasone by Defendants Grim and Davis on September 8, 2016, were unreasonable seizures, excessive, unnecessary, and unlawful, in violation of the Fourth Amendment and 42 U.S.C. §1983. These included:

28

(a)     the attack and application of the chokehold by Defendant Grim.

(b)     the seizure on the porch causing Plaintiff's broken arm by Defendants Grim and Davis.

(c)     the unduly tight and forceful handcuffing, and the refusal to loosen them, by Defendant Grim.

89.     The use of force upon Mr. Lampasone by Defendant Coblentz on September 9, 2016 was an excessive, unnecessary and unlawful seizure in violation of the Fourth Amendment and 42 U.S.C §1983.

### THIRD CLAIM - MALICIOUS PROSECUTIONS

90.     The prosecution of Mr. Lampasone for "disorderly conduct" by Defendant Grim, arising from the incident of August 18, 2016, constituted malicious prosecution in violation of the Fourth Amendment and 42 U.S.C. §1983.

91.     The prosecution of Mr. Lampasone for criminal "violation of a protection order" by Defendants Grim, Ingram and Davis, arising from the incident of October 17, 2016, constituted malicious prosecution in violation of the Fourth Amendment and 42 U.S.C. §1983.

### FOURTH CLAIM - RETALIATION

92.     Several of the actions of the Defendants as alleged above were adverse actions taken against the Plaintiff, which were motivated in whole or in part by the Plaintiff's having engaged in constitutionally protected activity such as speech, and which would deter a person of ordinary firmness from continuing to engage in that constitutionally protected conduct.  These retaliatory actions were all in violation of the First Amendment

29

and 42 U.S.C. §1983. These retaliatory actions included:

(a)  Defendant Grim's threats, temporary eviction of the Plaintiff from his home, and interference with Plaintiff's parental rights and family relationships, regarding the incident of July 12, 2016;

(b)  Defendant Grim's prosecution of the Plaintiff arising from the incident of August 18, 2016;

(c)  Defendants Grim and Davis's uses of force upon the Plaintiff, arrest of the Plaintiff, and prosecution of the Plaintiff, regarding the incident of September 8, 2016;

(d)  Defendant Coblentz's threats, harassment, use of force, restriction of movement and interference with the parental rights and family relationships of the Plaintiff, regarding the incident of September 9, 2016;

(e)  Defendants Grim, Ingram and Davis's prosecution of the Plaintiff arising from the October 17, 2016 incident.

## FIFTH CLAIM - INTERFERENCE WITH FAMILY RELATIONSHIPS

93.  When the Defendants used threats and the coercive power and authority of their law enforcement positions to separate the Plaintiff from his children, they interfered with his parental rights and family relationships in violation of the Fourteenth Amendment and 42 U.S.C. §1983. These violations included:

(a)  the actions of Defendant Coblentz during the September 9, 2016 incident.

## SIXTH CLAIM - §1983 CIVIL CONSPIRACY

94.  The constitutional violations described above were the result of an understanding and agreement among members of the Tiltonsville Police Department, as

30

well as other persons not named as Defendants herein, to cause injury to James Lampasone by unlawful action.  The participants shared in a plan and general objective, and the overt acts described above were committed, in whole or in part, in furtherance of that general objective.  The Defendants exercised their authority in such a way as to improperly intervene in a civil dispute in a manner favoring and benefitting one of the parties over the other.

### SEVENTH CLAIM - UNLAWFUL DEPRIVATION OF PROPERTY

95.     The said acts of Defendants in removing the Plaintiff from his home by the exercise of state action, including affirmative intervention, intimidation and threat of arrest, constituted violations of Plaintiff's rights to possession of his real and personal property, in violation of the Fourth Amendment and 42 U.S.C. §1983; and deprivation of his property without due process of law, in violation of the Fourteenth Amendment.

### EIGHTH CLAIM - MUNICIPAL LIABILITY CLAIM

96.     The constitutional violations described above involving the actions of Defendant Chief Davis create liability as to the Defendant Village of Tiltonsville, because he is the highest-ranking policymaking official for the activities of the Tiltonsville Police department and his acts are those of, and attributable to, the Village.

97.     The constitutional violations described above involving the actions of the other Defendants were proximately caused in significant part by preexisting customs and policies of the Village of Tiltonsville, including unlawful practices and policies concerning the use of handcuffs, and the failure to adequately hire, train, supervise and discipline police officers; and many of these constitutional violations were ratified by the Defendant

31

Village.

98.     As a proximate result of the acts of the Defendants, Plaintiff has suffered, and continues to suffer, physical injury, pain and suffering; medical, legal and other expense; mental and emotional anguish and upset; loss of personal freedom, and other resulting damages.

WHEREFORE, the Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory damages, punitive damages, reasonable attorney fees and other costs incurred herein, and such other relief as may be proper.

Respectfully submitted,

*/s/ James D. McNamara*
James D. McNamara        (0002461)
Trial Counsel for Plaintiff
88 East Broad Street, Suite 1350
Columbus, OH 43215
(614) 464-2770
psilbach@yahoo.com


*/s/ Jeffrey Orr Brown*
Jeffrey Orr Brown        (0016762)
Co-counsel for Plaintiff
2017 Sunset Boulevard
Steubenville, OH 43952
(740) 282-1911
brown.jeffrey@comcast.net

<u>JURY DEMAND</u>

The Plaintiff hereby demands a jury of eight (8) persons to hear and decide this case.

*/s/ James D. McNamara*

James D. McNamara        (0002461)
Trial Counsel for Plaintiff